*211 Opinion by
Mr. Justice Moore.
Plaintiff in error, to whom we will refer as Armour, is here on writ of error to review a judgment entered in favor of Peterson for the sum of $24,500.00 on his claim for damages allegedly resulting from the negligence of Armour. The Industrial Commission of Colorado was a party plaintiff in the action due to the existence of subrogation rights arising under the Workmen’s Compensation law, but will not be mentioned further in this opinion.
Peterson was an employee of Kennedy Electric Company which had contracted to do certain electrical work at the plant of Armour in Denver, in what is known as the “Beef Kill Room.” The room in question was on the second floor of a building and was approximately nine or ten feet above the ground. Under the contract between Armour and Kennedy Electric Company the latter was to do all the work specified therein and furnish all tools and equipment to be used in the installation. The work was to be done only during hours when the plant was not in operation, and had progressed to completion in the afternoon of September 27, 1958. Peterson had worked the day before on the job and was working on it at the time of completion. There was nothing left to be done by the workers except to remove their tools and equipment from the second floor level where the last work was performed.
There were at least three exits through which the tools and equipment might have been taken. One was a stairway, another was an elevator, and a third way was to pass them out through an open doorway of the “kill room” from which they would have to be lowered to the ground. Peterson and his fellow worker elected to remove the tools in the manner last mentioned. Peterson left the “kill room” and went out and around to another part of the plant where he took possession of a “payloader” owned by Armour. It was equipped with *212 a lifter or hoist and a scoop or bucket which could be elevated to a point even with the bottom of the second floor doorway. The intent was to place the tools and equipment in the elevated bucket and lower them to the ground, thus avoiding the task of carrying them down the stairway or to the elevator. Peterson manned the payloader, started it and proceeded to a point at or near the open doorway, raised the boom or hoist arm together with the scoop, then attempted to get out of the driver’s compartment in order to assist his fellow worker in loading the tools and equipment in the bucket.
Peterson’s choice of exit from the driver’s compartment was from the left side of the cab under the boom arm. When he was part way out under the upraised boom it came down on his back and he was severely injured. His screams were heard by his fellow employee who rushed to his aid and summoned other help. They found him crushed and mangled with his leg hooked around the lever which controlled the raising and lowering of the boom. They were unable to use the lever to release him due to his being jammed between the lever and the steering wheel. Finally someone was able to bend the steering wheel and his leg was released from the lever and his rescuers were able to raise the boom and free him.
Peterson’s claim for damages is based on the allegations that the payloader machine was defective in that there were no locks provided to keep the boom from falling; that there were no screens, rails or other guards to keep him from moving into the dangerous position in which he found himself; and that there was a hidden defect in the hydraulic equipment as a result of which the boom dropped unexpectedly; all of which Armour knew or should have known.
Peterson’s testimony disclosed that he knew there were no screens or guard rails when he went on the machine. It further disclosed that he soon discovered after going on the machine, and before he attempted to *213 crawl under the boom, that there were no locks or other devices to guarantee that the boom could not fall; that the operation of the hydraulic device was jerky; and that he knew that the machine was not in good working condition and that it was dangerous and unsafe, having theretofore had considerable experience in operating similar machines.
 Peterson'was not required to use this machine in performing his job or to remove the tools and equipment. The record clearly discloses that he had no permission from Armour or any of its authorized employees to use the payloader machine for any purpose. At the time of his action in taking the machine for the use which he intended, no Armour employees were present or had any knowledge of his intention to use the machine for any purpose. His action in leaving the part of the plant where his work was performed and procuring the payloader from a considerable distance away from his place of work, was the act of a trespasser, and his unauthorized use of the machine cannot give rise to a claim against Armour.
“Trepassers and mere licensees take the premises as they find them. The owner of premises is not under the same obligation to trespassers and licensees as he is to those who are upon the premises by his express or implied invitation. To the latter he owes a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed defects. To the former he owes no such duty, but as to them he is under obligation not wilfully and intentionally to injure them or, as it is sometimes expressed, not to injure them after becoming aware of their presence. Of course, he must exercise reasonable care, after becoming aware of their presence, not to injure them by any affirmative act or force set in motion.” (Citing cases) Gotch v. K. & B. Co., 93 Colo. 276, 25 P. (2d) 719.
*214 From Hooker v. Routt Realty Company, 102 Colo. 8, 76 P. (2d) 431, we quote the following:
“ * * * To trespassers, a land owner owes only the duty of not injuring them by any affirmative act after becoming aware of their presence.”
See also Roessler v. O’Brien, 119 Colo. 222, 201 P. (2d) 901. Not until after the accident did Armour have knowledge that Peterson had attempted to make use of the payloader. Under such circumstances Armour had no duty to warn plaintiff of any defects, if any there may have been. Crandall v. Mountain States Telephone and Telegraph Co., 149 Colo. 140, 368 P. (2d) 414.
It follows that the trial court erred in refusing to direct a verdict for Armour. The judgment is reversed and the cause remanded with directions to dismiss the action.
Mr. Justice Hall and Mr. Justice Pringle concur.